Good morning, your honors. May it please the court. Orion Denevers, on behalf of Appellant George Anibowei, who's here with us today. Millions of American citizens enter or exit the United States every day. According to the government, border agents may seize the cell phones of every single one of them and search those phones for hours without a warrant or any individual assistance. I'm well aware that nobody wants to have their phone looked at when they're coming in from out of the country back into the country. But my question to you is, if we have to follow the rule of orderliness and follow our prior cases, how can we reverse on your side? Your honor, we completely understand the court's concern. If the court does conclude it's bound by the decisions in Castillo and Malik, we respectfully ask the panel to recommend this case be reviewed en banc because we believe it presents an incredibly important question on which the circuits are splintered. We do believe— How can we be bound? You said if we conclude that we are bound. What other—how could we not be bound by Castillo and Malik? Your honor, we do believe that we're pressing issues here today that weren't pressed in those cases, and we think under the rule of orderliness, the court may consider the question anew. Again, we understand if the panel does conclude that it's bound by those cases, and we just respectfully request that the panel refer—or recommend this case be taken up en banc. I will just quote from the decisions in Castillo and Malik to address the court's concern. So Castillo, at page 895, concluded that adopting the circuit consensus was all it needed to decide the case. The appellant in that case had conceded that there was a circuit consensus on this issue. As I hope we've made clear in our briefing, that's not the case. And then in Malik, I think the court was even more explicit about leaving this question open. So it said at page 201, ordinarily, we would expect a party encouraging us to adopt a new constitutional theory to convincingly distinguish adverse authorities and discuss the contours of the doctrine he wishes us to adopt, but Malik has not done any of that. He has not discussed or analyzed Riley at any length, nor has he addressed the fact that every circuit that has faced this question has agreed that Riley does not mandate a warrant requirement for border searches. And at footnote 55—and this is really important—at footnote 55, the court explains that Malik had raised the Southern District of New York's decision in United States v. Smith in a 28-J letter, and the court says Malik did not urge this theory to us in his briefing, so we neither accept nor reject it, but declined to adopt it in this case. Our position is the Smith position that Malik expressly declined to reject, so we do think the court may be able to consider it here again. But again, we do understand if the court concludes it's bound by those decisions, and we believe that this case would merit en banc review so that the issues here can be fully ventilated before the full court. So what is the lay of the land on circuit courts on the issue of whether border searches allow this? So the courts are deeply fractured on this issue. More specific. On one side of the spectrum, you have the Fourth and Ninth Circuits. In the Ninth Circuit, a border search of a cell phone may be conducted only for contraband. Otherwise, Riley applies and a warrant of probable cause is required. In the Fourth Circuit, the rule is similar but a little bit different. The search must be for evidence of a transnational crime that has some nexus to the border search exception. Then you have several courts, including this one, that say no individualized suspicion is required for a manual search, but reasonable suspicion is required for a forensic search. So First, Eighth, Tenth, and Eleventh are with us. Is that correct? Well, Your Honor, I would say they're with you on the manual searches. I do think that those courts have left the forensic search question open. I think they have suggested that they might be with the Fifth Circuit on those cases, but they have left the question open because reasonable suspicion is present. So if we would go en banc, what is there to make you think that we would do something different? Because we think that under the unanimous Supreme Court's decision in United States v. Riley, the border, the warrant requirement does apply to cell phone searches at the border, and there are a few reasons for this. The first is a methodological point. So the Supreme Court in Riley held that any extension of existing warrant exceptions to digital data must rest on its own bottom, and that courts should not engage in a mechanical application of existing exceptions to cell phone. And the Court said the same thing in Carpenter. But in Castillo v. Malik, this Court assumed the opposite baseline and said that it saw no reason to extend Riley to border searches. That's at page 201 of Malik. So we think that the Court took the inverse methodological approach to deciding those cases that Riley requires. The second point is a historical one. The Supreme Court explained in Carpenter that as technology advances, the Fourth Amendment should be interpreted to assure the preservation of that degree of privacy that existed when the amendment was adopted in 1791. Ever since Lord Camden's storied decision eradicating the general warrant in Entik v. Carrington, the Supreme Court, our legal tradition has recognized that a man's private papers are his dearest property. The Supreme Court echoed that axiom in Boyd, explaining that private possessions act of 1789, duty officers were permitted only to search for dutiable goods and even then only based on reasonable suspicion. At the same time, the Court has long recognized that, as Justice Scalia put it in Kylo, the protection of the home is the very core of the Fourth Amendment. But Chief Justice Roberts explained in Riley for a unanimous Supreme Court that the typical search of a cell phone would expose to the government far more information than even the most exhaustive search of a home. So there's just no historical pedigree associated with the searches of papers, and if this Court adopts our position here, the government will have access to no more information than it had when the Supreme Court decided Boyd in 1886, when it decided Ramsey in 1975, when it decided Montoya de Hernandez, and even when it decided Flores Montaño in 2004 before the invention of the iPhone. The third point, of course, is Fourth Amendment balancing. The Supreme Court explained in Riley that the basis for extending an existing warrant exception to digital data must rest on its own bottom, and it's true that the balance usually strikes in the government's favor at the border, but it tips the other way in the context of digital data. So the Supreme Court has identified three traditional justifications for the border search exception. The first, the first is collecting duties on imported or exported goods, but the tariff laws apply to physical goods, so those goods aren't likely to be found on cell phones. The second is preventing the entry of unwanted persons, but of course no person can be smuggled into the country in a cell phone the way they can in the back of a pickup truck or an RV. Can we talk about this case for a second? Just for a second. The 2016 search, it was the type that was more intrusive. It was advanced search, but it's not actually at issue here. It is at issue. It is at issue, Your Honor. So yes, the 2016 search was a forensic search where agents informed Mr. Annie Bowie that they were copying and retaining his data. I thought that they were seeking APA vacatur of the directives, and which is not part of the 2016 search. Well, it's true that the directives were updated in 2018, but it's also true that Mr. Annie Bowie has alleged the government still retains his private data, and so we think the vacatur of the policy would result in deletion of that data. So what specifically, tell me what your client's complaint is. There are three, Your Honor. The first is what we've just been discussing, that the government still retains private data that it copied from his cell phone in 2016. Still retain the private data. Correct, Your Honor. The second is that Mr. Annie Bowie is subject to what we believe are unconstitutional searches every time he travels abroad, and he's a frequent international traveler. The third is that he's forced to leave his work cell phone at home every time he takes one of those trips to protect his duty of confidentiality to his clients. So those are the three injuries that he's alleged, and the district court agreed with all three of them. The government's disputed none of them on appeal. So that's why you believe the 16 is still relevant, because they still retain the data. Correct. Why does he go to Nigeria so frequently? He's on his work phone. He's from Nigeria, Your Honor. But what does his work phone have to do with that? You said he leaves it at home. Your Honor, he goes to Nigeria usually for weeks at a time to see friends and family, and he needs to remain available to his clients during that time. He doesn't go there to work, but he does remain available to his clients. He can't do his work while he's traveling. He can't keep up with it as well, because he doesn't have his work phone. That's right, Your Honor. Of course, these searches are not just limited to his work phone. There are also searches of his personal phone, which, of course, contains personal private data, messages with friends and family, photographs dating back years, medical records, bank records, location histories. As Chief Justice Roberts put it in Riley, these phones reveal an entire picture of a person's life dating back years in ways that the government could never have accessed in the old days, where we just lugged around a few suitcases on a trip, and that's what to retain the private data. Rather than saying we're done with the search for the border, and therefore we normally just wipe it out, we may do a real extensive advanced search, but we don't keep the data on file. Why are they keeping the data on your client? We don't know the answer to that, Your Honor. Under the policy, the government must have reasonable suspicion of some kind of a crime in order. Under the 2018 policy, they must have reasonable suspicion. Correct, but even in a forensic search, they must have reasonable suspicion to retain that data after copying it, so we don't know what basis they might have for that. You haven't had meetings with them about it or anything? The government has not disclosed why the data is still being retained, Your Honor. Okay. So at the same time that searches of the digital data on cell phones are incredibly intrusive, as Chief Justice Roberts put it, more intrusive than the most invasive search of a house, they also don't serve the traditional justifications for the border search exception. The border search exception was developed to prevent the introduction of a cell phone. It was developed to serve the nation's interest in protecting its sovereign territoriality, but anything that can come across the border on a cell phone can come across the border much more easily, digitally, electronically. There's no need to bring anything that might be contraband on a cell phone across the border on the physical phone itself. There's just nothing unique about the data on the phone to the phone itself. Do you have anything further? You saved time for rebuttal. You're welcome to make any other argument you have, but you don't think the APA thing is your best argument, do you? To the contrary, Your Honor. I think the APA argument is quite strong for us. The district court's conclusion was unprecedented in the 80 years of the APA. No court that we know of has ever concluded that an implied remedy under the Constitution displaces a claim under 706 of the APA. The district court cited no case for that proposition. The government has cited no case for that proposition. The government, as I understand it, has not even really defended the district court's conclusion in this case and has asked instead for a one-time only rule. That rule is contrary to Supreme Court precedent and several cases from this court. In Bowen, the Supreme Court made clear that the work 704 is doing is codifying the finality and exhaustion requirements while at the same time ensuring that the APA doesn't duplicate existing statutory review procedures. Anything further? Excuse me? Anything further? No, Your Honor. Okay. You save time for rebuttal. Chief Judge Elrod, members of the Court, may it please the Court, given that this case involves searches at the border, I think it's helpful to take a minute just to start by explaining what the implications of that are in terms of the government's interest. The case law is clear that the government has inherent authority to protect and it has, in fact, a paramount interest in, in fact, protecting its territorial integrity at the border. It's often said in the case law that the government's powers and authority and need to prevent unwanted persons and unwanted effects at the border is at its zenith. And this is all part of the sovereign's longstanding right to protect itself. But what is it about phones that could hurt coming in as opposed to, you know, something that's in your suitcase or whatever? Right, Your Honor. So a part of the sort of the sovereign's right and duty to protect itself involves all kinds of different national security implications, preventing and detecting the interdiction of unwanted persons, unwanted things, smuggling, human trafficking, drug trafficking, contraband, all these sort of constellations of issues at the border. And so the ability to look at cell phones is an important component of that insofar as looking at that, just like looking at, for example, papers that are carried by somebody can allow the government to, one, detect contraband, to detect other criminal activity that has a cross-border transnational nexus. These are all things that the, you know, information on a cell phone is potentially relevant to, just in the same way that information carried in a traveler's papers, in their wallet, and their other effects is also relevant to. You wouldn't keep a diary for 15 years. Why have you kept this data for 15 years? Or not 15, nine years. I'm sorry. You can do math. I'm sorry. Why has this? Why would this not be returned to him or deleted in your system? So I would say I'm not sure that the record reflects whether the data has been deleted or returned. And I want to say that the way that the plaintiff chose to do this case is the reason for that. And that is, is the plaintiff originally brought a number of claims that included sort of freestanding claims that would have required the expunction of data or the deletion of data, those sorts of things. Plaintiff. Are you telling me the government doesn't know whether or not you have his data still from 2016 that you're maintaining? No, I'm not saying that, Your Honor. I'm saying here that. So what's the answer? Is the government maintaining his data since 2016? And if so, why? What is the legitimate justification for that? Well, my understanding, again, and this is not in the record because the plaintiff did not choose to proceed with claims that would have involved discovery, that would have involved an exploration of what happened to the data. And so I will answer your question, Your Honor, to the best of my knowledge. But I just want to preface that because of the way the plaintiff chose to challenge the policies sort of facially. He did not proceed on his claims that challenged the search as to him individually. So this was not developed in the record, and that's why I just want to have that caveat. And I'll contrast that with the Malik case, which is one of the two, you know, cases that's on point here. The Malik case was also a case in our district. I'm very familiar with it. That case, the plaintiff did proceed with the same type of claims that Mr.  In that case, there was extensive discovery, and the location of the data, what happened to it, that was all part of discovery, and it was ascertained. So that has not happened here. That's why I just want to be very clear that, you know, the record doesn't reflect where the data is and what's happened to it. Now, my understanding is that I believe there still is data in the government's possession. And the reason I say that, one, is partially I believe when this litigation was filed, that would have triggered a litigation hold, you know, to make sure that the data was kept, if for no other reason, for purposes of this litigation. That's different completely. Is it being kept by the people that keep the border data, or the secretary of state, or something like in some, or sent to some law enforcement, not for litigation purposes, for you to be able to do your job, but is it being maintained, and if so, why? That I do not know, Your Honor, and the record doesn't reflect that. Because of the way this case has been litigated, it ended up being litigated just as a facial challenge to the policies. And so I just, I'm not able to answer your question, Your Honor. If there's a motion to produce filed against you, can you produce these documents? If there was a motion. This is just information. If there was a motion for discovery, right. If the plaintiff had proceeded in the case and had made discovery requests, then yes, we would have addressed it in discovery. For example, in the Malik case, that was part of the case. There was discovery requests for where is the data? Give us a copy of it. Who has it? And that was all produced. I was the attorney who handled that case. So that is absolutely something the government can and will do in this type of litigation. But the plaintiff here made a very deliberate choice to dismiss all of those claims that would have involved any of that sort of discovery. And remember, discovery is a two-way street. So we, for example, would have had the right to obtain discovery from him, to take his deposition. The plaintiff chose to forego all that and proceeded simply on what is essentially a facial challenge to these policies. So frankly, I think issues about what happened to the specific data here, why was a search done here, those issues just aren't really relevant to the actual legal issue here. Now, they're part of the background and explain why he has some standing for this, because he's been subjected to one of these searches. But otherwise, they're just not legally relevant would be our position. It seems so that the district court may have erred when dismissing the complaint under 12b-1. Okay. I understand your point, Your Honor. I don't think it did. I think if you look at what our argument was about the adequate remedy and what the sort of facts exactly show is I think what the plaintiff has done is he's made this argument that this dismissal was in some way this really massive overreach and that we'd have these results down the line in just all kinds of other cases. And I don't think that's the case. I mean, what the argument really was is we have this precedent in the Malik decision. And that case makes it very clear. In Malik, the claim that the plaintiff was proceeding on was a claim, you have my data. You know, you did one of these searches. I don't think it was proper. You still have my data. You have to give it back. You have to delete it. That was the claim in that case. And that claim allowed for fulsome discovery. We got to figure out where the data was, who had it, who'd seen it. That claim allowed the district court and this court to then weigh in on, you know, basically the constitutionality of these type of searches. So that is a remedy that, you know, essentially allows for a full judicial review of all these issues. The point here was Mr. Annabouie had that same remedy available to him. He had pled those claims, and then he chose to voluntarily dismiss them and decided not to. So I think under the sort of plain text of 704, there was an adequate remedy. He was, in fact, pursuing it, and then he decided not to. And so that's what we think triggered that. The injunction is not statutory. And so I don't see how the injunctive relief would satisfy that under 12B1. How do you fix this procedural conundrum? What do you suggest the court do that is legal and appropriate here? I understand the court's point. If the court thinks that the 704 adequate remedy has to be a statutory remedy, which I think is what Your Honor is hinting at, then you're right that it's not a statutory remedy. And I think ---- Well, it wouldn't be just the court thinking that out of some sort of preference of the court. It would be the law. And, again, I'm not 100% sure. I mean, if you look at the text of 5---- Then if so, so if it's not, then what happens? Okay. If it's not, I mean, I think that if it's not an adequate remedy, then I think that that's fine. And the court can, you know, the court can consider what happened here essentially on the merits, which is do these policies that ---- So what should we hold that would be appropriate, consistent with the law here? I mean, I think what you, I think what the court can hold is that as, you know, Mr. Anabowy, you know, stated in the district court that his claims were foreclosed by existing precedent. He conceded that in the district court. That's on page 1244 of the record. There's also a statement on 1106 of the record. He conceded that these claims were foreclosed. And I think the district court here held one of its two grounds for dismissal was exactly that, that these claims failed under existing precedent. And I think this court can hold the same thing. Okay. And this would be a dismissal under what? I believe it would be a 12B6 dismissal. Instead of a 12B1 dismissal. And the 12B1 issue of, I think there's, I think the district court properly or not improperly looks to some case law that referred to the adequate remedy issue as being jurisdictional. Now, I think there's also case law more recently where this court has said, well, that was one of these sort of, we use the word jurisdictional but not in the true meaning of jurisdictional. And I think so there's other case law that indicate that it's not actually a jurisdictional. So you're not saying 12B1 was right? I mean, I don't think 12B1 was wrong here under that case law that the district court relied on. But I don't think. Are you here defending that? Well, yes, I guess so. I think that the decision should be affirmed. But are you defending the reasoning of the district court under 12B1 or not? Right. I think I am, yes. If. You are. I just thought you said you're not sure and you're not really knowing and we could do it some other way. I say that all, Your Honor, because I think at the end of the day it doesn't really matter, right? If there's been, I know there's plenty of case law that talks about, well, is an exhaustion requirement. Well, I mean, 12B1 is without prejudice and 12B6 is with, so that does matter. It's not just, oh, we should put a different number down. Right. I think, I mean, I don't, it matters in that sense. But I think typically, I guess it's either a mandatory claim processing type rule or jurisdictional. I don't think it matters either way. I don't believe he's arguing that the dismissal should be converted to with prejudice, I guess, would be what the argument is. So I don't, I guess I'm not seeing any error that caused any problem. Okay. I'm sorry if that's confusing. I mean, I think it is true that as this. But you're not robustly defending the ruling by saying, oh, no, this is correct and this is why. You're not doing that. Okay, let me be. So then that is very confusing. Okay. I understand, Your Honor. I do think that the adequate, there was another adequate remedy available to Mr. Annabooie here. And he decided to not pursue that remedy and voluntarily dismiss those claims. So I think in that sense, the adequate remedy provision was properly done here. Now, whether that's jurisdictional or non-jurisdictional, I'm agnostic on that. I think the district court did not err in saying it was jurisdictional based on the case law at the time. But I recognize that there's other case law that says, well, maybe it's not actually jurisdictional. It's just a rule. So I think that's where I stand on that. Are we out of step with our brethren and sistren? Out of step in respect to that issue? The Riley case. So, Your Honor, no, I don't think this court is. In the Castillo case, for example, this court recognized that, obviously recognized that Riley existed. Riley's now been on the books since 2014. In the Castillo case, this court recognized that cell phones are what the court said was fundamentally different and that there is this potential for a very intrusive search by reason of cell phones and the amount of information they can carry. Notwithstanding all those factors, the court nonetheless held as it did, you know, that there was no warrant requirement. And that approach is not at all out of step with other circuits. In fact, I think, you know, as we talk about in our brief, this circuit, you know, the claim of a circuit split here, I think on closer inspection, does not actually exist in the way that appellant maintains. Are you saying there is no circuit split here? There is a Ninth Circuit case that does not require a warrant for any border search, but does, the Ninth Circuit case does sort of cabin the border search, the scope of the permissible border search that can be done without a warrant, cabins that to searches for contraband only. But those searches, you know, which is what the Ninth Circuit conceives of as the proper scope of a border search, do not require a warrant even under the Ninth Circuit. The Fourth Circuit is the other circuit that's been sort of identified here as potentially giving rise to some sort of split, and I just think that's not actually borne out in the case law. The one Fourth Circuit case that, it's called the IJBCON case, A-I-G-B-E-K-A-E-N, again, that case did not say that a warrant is required for any border search. It said that when the government conducted a forensic search in that particular case, it did not have reasonable suspicion of a border-related crime. So there was evidence that the defendant in that case had been involved and was involved in domestic criminal activities, but the court said there was no border nexus, so therefore it didn't support a border search. But again, that is not a circuit split, and I will say, more importantly, because the, remember, the only issue in this case is whether these policies, the CBP and ICE policies, are sort of facially invalid. And the policies themselves, which are the thing that are ultimately under review here, the policies themselves recognize that there needs to be a border nexus to do a border search. The policies talk about, you know, with reasonable suspicion, these more advanced searches can be conducted, and the policies talk about reasonable suspicion of contraband or some sort of border-related crime or national security interest. So the policies are consistent with essentially, you know, the Fourth Circuit's opinion, this court's opinion, and all these other circuits. How have the cases been worked out regarding the lawyers who complain about their phones being, and their confidential data being? Right. So I'm aware of two cases. The Malik case in this circuit, which, like I said before, it was actually my case, so I'm very aware of that. In the Malik case, Mr. Malik, at the time the search was beginning, he specifically asserted, I'm a lawyer and, you know, there's going to be privileged information on this phone because of that, and the policies all account for this, right? So the policies talk about procedures if there is privileged or otherwise confidential information, and it goes essentially on a separate track that really, you know, counsel gets involved. There's a segregation of material so that. So you don't keep all of that material then indefinitely. No, that's correct. So the policy doesn't allow that. What about for trade, like if his business, the incident plaintiff had, if his business had trade secrets, for example? Same idea. So the policies talk about, you know, it's not just attorney-client privilege but trade secrets. So that is funneled to this other method, and they don't keep the trade secrets. So if he had his business phone and it was trade secrets or otherwise recognized privileges at law, it would not be confiscated in the same way and retained. That's right. And let me, the policies, which, again, are what's at issue here, the policies talk about searching the phones, but then the policies also separately talk about if you're actually going to seize or keep copies of information from the phone. And so there's two different sort of showings that are required. In order to do the search, for example, one of these forensic searches, the policies require reasonable suspicion. Now, the policies go on to say if you're doing a search, whether it be a basic, you know, suspicionless search or a reasonable suspicion more advanced search, if there's actually data on there that you want to keep, in other words, we're going to either take photocopies of it or pictures of it or download it or whatever. If there's data that's going to be kept, there needs to actually be probable cause, you know, that this data is somehow relevant to a crime. Which is what he's saying, that they've kept his data. Right. I understand him to be saying that his data has been kept here, although, again, I'm not trying to be tricky here, but he does not have a claim in the case that says, you still have my data and I want you to give it back. He had those claims and he dismissed them. And his only claim now is simply a vacator of the policies. And that claim doesn't turn on whether his data was kept or wasn't kept. He could have just been somebody who was at the border and didn't like the fact that they looked at his phone, but they didn't keep any data. So that's, you know, I'm not trying to be, you know, cute with it, but I just don't think it's relevant here because of the way that this claim has been pleaded and what this sort of very narrow focus is, which is, do these policies, you know, violate the Administrative Procedure Act? I think at the end of the day, you know, as the Supreme Court has said, the Fourth Amendment balance is struck differently at the border. And so we know that there's this sort of constellation of very important sovereign interests in protecting the border, detecting and interdicting contraband, but also ongoing cross-border criminal efforts. These are all very strong interests of the sovereign. Now, on the other side, as this Court has recognized, you know, a cell phone has a lot of information. Nobody's disputing that. But at the same time, there is also a, what the courts have called, a severely diminished expectation of privacy at the border. That's because of a historical practice. People know that they're going to be searched at the border, including, you know, very intrusive body searches, things like that. There's a longstanding tradition of that. When you leave the country or are coming back to the country, you're most likely going to another country that's going to have its own border search, another reason that the expectation of privacy is lower. And also, at the end of the day, a port of entry, where somebody is attempting to come or go into the country, is just not the home. I heard a reference to how the home is sort of this hallowed place of the Fourth Amendment, but the port of entry is not the home. So this Court's precedent makes clear that the policies that are at issue here are consistent with the Fourth Amendment. For that reason, we ask the Court to affirm. Thank you. Your Honor, on the APA question, the Court asked counsel if the district court's conclusion under 12b1 was right, and he said it wasn't wrong. He declined to say it was right, and here's why. In Fort Bend County, this Court said the 704 exception will apply only if there is clear and convincing evidence of legislative intent to create a special alternative remedy and thereby bar APA review. In Royerson, this Court said Section 04 applies only when there is clear and convincing evidence of legislative intent to create a special alternative remedy. In Enohosa, the Court said Section 04 is triggered by legislative intent to create an alternative remedy, and counsel conceded that an implied action under the Constitution is not a statutory remedy. Under all of those cases, the district court's conclusion on the APA question was an error, and as this Court said in Porter v. Califano in 1979, addressing a First Amendment claim brought under the APA, the Court permitted that claim to proceed, even though the plaintiff would, of course, have a right to sue directly under the Constitution. Why isn't the remedy that it's just 12b-6? So that brings us back to the Fourth Amendment question, Your Honor. So what do you get? What do you get if you went on that it shouldn't be 12b-1, that that's an error? What do you get? I think that clears the path to proceed to the Riley question in this case and the merits of this case, which, as we've explained, we think the Court can address here, but if not, we urge the Court to recommend this case for en banc review because the question here is one of exceptional importance that has splintered the circus, and we think, with great respect, Malik and Castillo were wrongly decided. Under the government's position in this case. But if we're following those cases, that's a 12b-6, so we would be affirming on a 12b-6, not a 12b-1, so you would go from a lesser problem to a bigger problem, right? Well, of course, if the Court believes it is bound by those cases, we're going to be in trouble at this stage either way, which is why we would urge the Court to recommend the case be taken up en banc. But you don't care about with or without prejudice? We think the Court should reverse the district court's conclusion on the APA issue under 12b-1. We think the Court can address the Riley issue under 12b-6, but if the Court does conclude that it's bound by Castillo and Malik, we would request the Court recommend this case be taken up en banc because the privacy interests at stake in this case cannot be overstated. The government's position is that any time any U.S. citizen crosses a U.S. border, border agents can spend hours scrolling through their phone, reviewing private— Why would you want en banc instead of going up to the Supremes? Because this strikes me as something that the whole country should be the same on because people come flying in all around the country. It's not just in Texas that they fly in coming from out of the country. So if in one circuit nobody can look at your phone, but in another they're all sitting around looking at your phone for hours, that's really odd. So wouldn't it be better to just let the Supremes say yes or no or do something in between? Your Honor, for the last nine years, our client, George Eneboe, has been unable to travel internationally with his work cell phone. We're here to get him relief, and so we think the most likely prospect of relief is to first request en banc review in the Fifth Circuit, and then if necessary, yes, we will seek certiorari before the Supreme Court. We did that at the preliminary injunction stage. The government has asked the Supreme Court to review this question in the Canoe case. We do think that it's worthy of Supreme Court review, but of course we would go to the en banc court first, most likely so that we could ensure and give our client the most opportunities to get relief in this case. Respectfully, we would ask the court to reverse the district court or in the alternative recommend this case be taken up en banc. Thank you. We have your argument. We appreciate both arguments. This case is submitted. Thank you. The court will take a brief recess before considering.